**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| WILLIAM NOBLE BURKHART,<br>Derivatively on Behalf of Nominal Defendant<br>INOTIV, INC.,<br><br>       Plaintiff,<br><br>      v.<br><br>ROBERT W. LEASURE, JR., BETH A.<br>TAYLOR, GREGORY C. DAVIS,<br>RICHARD A. JOHNSON, JOHN E.<br>SAGARTZ, R. MATTHEW NEFF, NIGEL<br>BROWN, and SCOTT CRAGG,<br><br>       Defendants,<br><br>    and<br><br>INOTIV, INC.,<br><br>       Nominal Defendant. | Case No.    4:23-cv-3<br><br>**VERIFIED STOCKHOLDER**<br>**DERIVATIVE COMPLAINT** |

Plaintiff William Noble Burkhart ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Inotiv, Inc. ("Inotiv" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and contribution for violations of Sections 10(b) and 21D of the Exchange Act. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Inotiv with the U.S. Securities and Exchange Commission ("SEC"), press releases, news

reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.      Inotiv, together with its subsidiaries, operates as a contract research organization specializing in nonclinical and analytical drug delivery and development services.

2.      On November 5, 2021, Inotiv acquired Envigo RMS Holding Corp. ("Envigo") for $271 million. As a result, the Company's operations now include breeding, importing and selling research-quality animal models for use in laboratory tests, manufacturing and distributing standard and custom diets, distributing bedding and enrichment products, and providing other services associated with these products. Envigo has facilities throughout the country, including one in Cumberland, Virginia (the "Cumberland Facility").

3.      Inotiv's acquisition of Envigo was purportedly supported by extensive due diligence, including site visits. Unbeknownst to stockholders, while this due diligence was conducted, U.S. regulators found numerous violations of the Animal Welfare Act at the Cumberland Facility and issued directives to Envigo to remediate them.

4.      On May 20, 2022, after the market closed, Inotiv disclosed a DOJ complaint filed against Envigo alleging violations of the Animal Welfare Act, after the DOJ had executed a search and seizure warrant at the Cumberland Facility. On May 21, 2022, Judge Moon of the United States District Court for the Western District of Virginia issued an amended temporary restraining order; citing the "overwhelming evidence" provided by the U.S. Department of Justice ("DOJ"), the order found that "Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's implementing regulations to provide adequate veterinary care."

5.      On this news, the Company's share price fell $5.19, or 28%, to close at $13.14 per share on May 23, 2022.

6.      On June 13, 2022, after the market closed, Inotive announced that it was closing two Envigo facilities, mere months after the acquisition, due to the significant investments required to improve the facility. On this news, the Company's share price fell $0.25, or 2%, to close at $12.78 per share on June 14, 2022.

7.      On November 17, 2022, Inotiv revealed that the U.S. Attorney's Office for the Southern District of Florida criminally charged employees of the Company's principal supplier of non-human primates ("NHPs") with conspiring to illegally import NHPs into the U.S. from December 2017 through January 2022. On this news, the Company's share price fell $9.03, or 57%, to close at $6.82 per share on November 17, 2022.

8.      These revelations precipitated the filing of a securities class action in this District against Inotiv and certain of the defendants named herein, captioned *In re Inotiv, Inc. Securities Litigation*, Case No. 4:22-cv-00045 (the "Securities Class Action").

9.      Plaintiff did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act and contribution for violations of Section 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

12.     Plaintiff William Noble Burkhart purchased shares of Inotiv stock in August 2021 and has continuously owned his Inotiv stock since that date.  He currently owns 6,629 shares.

**Nominal Defendant**

13.     Nominal Defendant Inotiv is an Indiana corporation with its principal executive offices located at 2701 Kent Avenue, West Lafayette, Indiana 47906.  The Company's common stock trades on the NASDAQ under the symbol "NOTV."

**Defendants**

14.     Defendant Robert W. Leasure, Jr. ("Leasure") has served as Chief Executive Officer ("CEO") and as a director of the Company since January 2019. He is named as a defendant in the Securities Class Action.

15.     Defendant Beth A. Taylor ("Taylor") has served as the Company's Chief Financial Officer ("CFO") since March 2020. She is named as a defendant in the Securities Class Action.

16.     Defendant Gregory C. Davis ("Davis") has served as a director of the Company since June 2017.

17.     Defendant Richard A. Johnson ("Johnson") has served as a director of the Company since May 2012.

18.     Defendant John E. Sagartz ("Sagartz") has served as a director of the Company since July 2018.

19.     Defendant R. Matthew Neff ("Neff") has served as a director of the Company since August 2017.

20.     Defendant Nigel Brown ("Brown") has served as a director of the Company since November 2021.

21.     Defendant Scott Cragg ("Cragg") has served as a director of the Company since November 2021. Cragg was previously a director of Envigo.

22.     Defendants Leasure, Taylor, Davis, Johnson, Sagartz, Neff, Brown, and Cragg are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers, directors, and/or fiduciaries of Inotiv and because of their ability to control the business and corporate affairs of Inotiv, at all relevant times, the Individual Defendants owed Inotiv and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Inotiv in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Inotiv and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Inotiv and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inotiv, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Inotiv, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

25.     To discharge their duties, the officers and directors of Inotiv were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Inotiv were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

26.     Inotiv, together with its subsidiaries, operates as a contract research organization specializing in nonclinical and analytical drug delivery and development services.

27.     On November 5, 2021, Inotiv acquired Envigo RMS Holding Corp. ("Envigo"). As a result, the Company's operations now include breeding, importing and selling research-quality animal models for use in laboratory tests, manufacturing and distributing standard and custom diets, distributing bedding and enrichment products, and providing other services associated with these products. Envigo has facilities throughout the country, including one in Cumberland, Virginia (the "Cumberland Facility").

28.     Envigo is subject to state and federal rules and regulations concerning the treatment of animals. Specifically, Envigo must comply with the Animal Welfare Act ("AWA"), which "requires that minimum standards of care and treatment be provided for certain animals bred for commercial sale; used in research, teaching, or testing; transported commercially; or exhibited to the public."

**B.     The Individual Defendants Purportedly Conducted Due Diligence Prior to the Envigo Acquisition**

29.     Inotiv first explored a potential acquisition of Envigo in November 2019 when defendant Leasure met with defendant Cragg (then a member of Envigo's Board) as part of "an ongoing effort to meet leaders in the industry and ongoing efforts to evaluate strategic opportunities." Discussions continued until May 2021 when defendants Leasure and Cragg discussed the preliminary considerations of a business combination of the two entities and entered a mutual nondisclosure agreement.

30.     Then, on June 17, 2021, defendants Cragg, Leasure, Sagartz, and members of Envigo's management team met to discuss the potential acquisition. Defendant Cragg and Envigo's management "provided a corporate overview of Envigo that covered multiple aspects of Envigo, including assets, strategy, operations, financial position, marketing and business development, and commercial agreements." Similar meetings were held throughout the month "to review business opportunities, organization opportunities, outline strategic opportunities and synergies for a combined company."

31.     Defendant Leasure updated the Board on the status of due diligence and potential deal structure for Envigo on July 2, 2021 and July 7, 2021.

32.     On July 12, 2021, defendant Leasure emailed an initial non-binding indication of interest letter to defendant Cragg.

33.     On July 14, 2021, defendant Leasure met with defendant Cragg and Envigo's then CEO to discuss "strategic issues related to the proposed transaction, organizational issues, additional due diligence issues, and further deal structuring issues."

34.     After updating the Board on the status of the acquisition activities, defendant Leasure conducted an initial due diligence site tour to visit 17 of Envigo's 22 locations, including in Virginia, between July 20 and August 20, 2021.

35.     On September 17, 2021, management updated the Board on the due diligence conducted to date, and on September 21, 2021, the Board received an opinion from Jefferies that the acquisition was fair, from a financial point of view, to Inotiv.

### C.     Multiple Regulatory Inspections Uncovered Extensive Animal Welfare Violations at the Cumberland Facility

36.     On July 20-21, 2021, the U.S. Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") animal care unit conducted an unannounced inspection of the Cumberland Facility and identified dozens of violations of the AWA, including failure to provide adequate veterinary care; failure to provide uncontaminated, palatable, and nutritive food in sufficient quantity; failure to keep dogs safe; exposing dogs to unsanitary and unsafe conditions; failure to employ sufficient qualified employees; and failure to make and retain accurate and complete records. USDA inspectors set deadlines ranging from July 23, 2021 to August 31, 2021 to allow Envigo to take corrective action.

37.     USDA inspectors conducted another inspection of the Cumberland Facility on October 25, 2021 and determined that Envigo failed to correct 11 areas of noncompliance. Again, Envigo was given an opportunity to take corrective action by November 8, 2021.

38.     USDA inspectors conducted another inspection of the Cumberland Facility on November 16, 2021 and found 26 categories of AWA violations.

D. **The Individual Defendants Cause Inotiv to Issue a Materially Misleading Proxy Statement**

39.     On October 5, 2021, defendants Leasure, Davis, Johnson, Sagartz, Neff, and Cragg caused Inotiv to issue a definitive proxy statement soliciting stockholder votes in advance of the special meeting to be held November 4, 2021 to vote on conditions necessary to effectuate the merger of Inotiv and Envigo. Specifically, the proxy statement solicited stockholder approval in favor of four management proposals, including: (i) an amendment to the Company's articles of incorporation to increase the number of authorized shares to 75 million ("Authorized Share Increase Proposal"); (ii) approve the issuance of common shares pursuant to the merger agreement ("Merger Share Issuance Proposal"); and (iii) an amendment to the 2018 Equity Incentive Plan (the "2018 EIP") to increase the number of common shares available for awards thereunder by 1.5 million shares. The consummation of the Envigo acquisition is conditioned on stockholder approval of the Authorized Share Increase Proposal and the Merger Share Issuance Proposal.

40.     Defendants Leasure, Davis, Johnson, Sagartz, Neff, and Cragg solicited stockholder approval of the Envigo acquisition citing, among other things, "[t]he Board's knowledge . . . of Envigo's business, operations, financial condition, earnings and prospects, taking into account the results of Inotiv's due diligence review of Envigo[.]" As to Envigo's operations, the proxy statement stated, in relevant part:

**Envigo Overview**

***Envigo is primarily a products business that provides research-quality animals*** for use in laboratory tests, as well as standard and custom laboratory animal diets and bedding and other associated services for contract research organizations, biopharmaceutical companies, universities, governments and other research organizations. ***It provides customers with laboratory animals used in basic research and product development and non-clinical testing of compounds to support the development and approval of new medicines.*** Utilizing its portfolio of products, Envigo enables its customers to create a more flexible product development model and reduce their costs, enhance their productivity, and increase speed to market. ***Envigo's vision, working together to build a healthier and safer***

***world, includes helping its customers meet certain regulatory requirements*** in order to bring life-saving and life-enhancing new medicines to patients.

Envigo is a leading commercial provider of RMS [Research Models and Services] products and services globally and has been supplying research models since 1931. . . .

Envigo's RMS business is comprised of (1) Research Models, (2) Diets and Bedding, and (3) Research Model Services.

*Research Models.* The research models business is comprised of the commercial production and sale of laboratory animals and research models, principally purpose-bred rats and mice and large animal models (NHPs, canines and rabbits) for use by researchers. Envigo provides models to numerous customers around the world, including many academic institutions, government agencies, biopharmaceutical companies, and contract research organizations. Envigo has a global footprint with production facilities strategically located in six countries. ***Its operations are located in close proximity to its customers, enabling Envigo to provide consistent customer service with a high degree of focus on animal welfare.***

41.    The proxy statement purported to warn that any failure to comply with governmental regulations could harm Envigo's business.

***Failure to comply with applicable governmental regulations could harm our business.***

***Envigo is subject to a variety of governmental regulations***, particularly in the United States, Europe, and the United Kingdom, relating to animal welfare and the conduct of our business, including … U.S. USDA Animal Welfare Regulations. ***Our facilities are therefore subject to routine formal inspections by regulatory and supervisory authorities***, including the U.S. FDA, the U.S. USDA and the U.K. Home Office, as well as by representatives from customer companies.

***Envigo expends significant resources on compliance efforts.*** Regulations and guidance worldwide concerning the production and use of laboratory animals for research purposes continue to be updated. … Similarly, guidance has been and continues to be developed for other areas that impact the biomedical research community on both a national and international basis, including transportation, import and export requirements of biological materials, and animal housing and welfare. Certain of our customers may require us to comply with any new guidance in advance of our implementation as a condition to being awarded contracts. ***Conforming to new guidelines may result in increased costs attributable to adding or upgrading facilities, the addition of personnel to address new processes and increased administrative burden.***

42.     The 2018 EIP authorizes the issuance of shares of the Company's common stock for equity awards to Inotiv's employees and directors. As of October 4, 2021, the 2018 EIP had 396,167 shares of common stock available for future grant pursuant to the plan. Equity pursuant to the 2018 EIP is effectively awarded at the discretion of the Board, according to the proxy statement:

> *Administration.*   The Committee has the authority and responsibility to administer the Amended Plan, except for awards to non-employee directors, which are administered by the Board. The Committee consists solely of not less than two members intended to be "non-employee directors" within the meaning of Rule 16b-3 of the Securities Exchange Act of 1934, as amended, "outside directors" under regulations promulgated under Section 162(m), and "independent directors" under NASDAQ rules. The Committee may exercise broad discretionary authority in the administration of the Amended Plan, including the authority to determine the treatment of awards upon an employee's retirement, disability, death, or during a leave of absence. In addition, the Committee is authorized to delegate some or all of its ministerial duties to one or more of its members or to one or more employees or agents of the Company.

43.     The proxy statement solicited stockholder approval of an amendment to the 2018 EIP to increase the number of shares of common stock reserved for issuance thereunder by 1.5 million shares. If approved, the total number of shares reserved for issuance would be 1,896,167, which represents 11.8% of the Company's common stock outstanding as of October 4, 2021.

44.     The proxy statement was materially misleading because it failed to disclose that Envigo was already on notice of existing violations of applicable regulations at its Cumberland Facility, that Envigo had failed to remediate these violations when given the opportunity to do so, and that the continued violations were reasonably likely to expose Envigo to regulatory action. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

45.     On November 5, 2021, Inotiv filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In particular, Authorized Share

Increase Proposal, the Merger Share Issuance Proposal, and the amendment to the 2018 EIP were approved. These approvals based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and their continued enrichment at the expense of the Company's unaffiliated stockholders.

> ### E.   The Individual Defendants Cause the Company to Issue Materially Misleading Statements

46.   On December 21, 2021, the Individual Defendants caused Inotiv to file its annual report on Form 10-K for the period ended September 30, 2021 (the "2021 10-K"), which touted Envigo's purported "high standards of animal welfare." The 2021 10-K was signed by the Individual Defendants. It stated, in relevant part:

> *Envigo's Competitive Strengths*
>
> We believe that Envigo is well positioned to capitalize on favorable trends in the research industry and provide differentiated solutions to our customers based on the key competitive strengths set forth below:
>
> . . .
>
> *Commitment to animal welfare.* ***Envigo is on the forefront of humane care of laboratory animals*** and implementation of the "3Rs" (Replacement, Reduction and Refinement). ***Envigo maintains high standards of animal welfare as evidenced by its strong compliance record with regulators across the globe.*** Envigo frequently advises our customers in matters relating to animal welfare, including enrichment, housing and animal husbandry.
>
> \*      \*      \*
>
> *Industry Support and Animal Welfare*
>
> Envigo is committed to delivering first-class health and genetic quality, operational performance and customer service. ***High standards of animal welfare are vital to each of these, and so are integral to Envigo's business success.***
>
> ***Envigo has been at the forefront of animal welfare improvements and the humane care of laboratory animals.*** Envigo is a leading advocate for implementation of the 3Rs (Replacement, Reduction and Refinement). Members of Envigo's scientific and technical care staff undertake continuing professional development in the field of laboratory animal science, with special focus to animal

welfare and the 3Rs, and they are encouraged to publish and present within the scientific community.

Envigo has formed an internal Institutional Animal Care and Use Committee, comprising staff from many disciplines within Envigo, in addition to external representation, *to comply with applicable regulations and provide strict oversight of animal welfare matters.* Envigo's animal production facilities in the U.S. and the Netherlands, are accredited by the Association for Assessment and Accreditation of Laboratory Animal Care International ("AAALAC"), a private, non-profit, international accrediting organization that promotes the humane treatment of animals in science through voluntary accreditation and assessment programs. *Envigo's facilities are routinely inspected by government agencies tasked with enforcing animal welfare regulations.* …

Laboratory animals remain an essential component in the research and development that our customers conduct. They further our knowledge of living systems and help in the discovery and development of products that can save or enhance people's lives. *Envigo works with the scientific community to improve our understanding and promote best practice in the care and welfare of research animals. As providers of research models to the research community, Envigo is responsible to our customers and the public for the health and well-being of the animals in our care.*

47.     With respect to regulations, the 2021 10-K stated that "Envigo is regularly consulted and inspected by the relevant national authorities in order to ensure continued compliance with the legal requirements in each nation in which it operates." The report also stated that Envigo was appealing certain non-compliance findings without discussing the ongoing nature of these violations and the repeated failure to remediate them:

**We are subject to periodic inspections by regulatory authorities which could lead to enforcement actions if those authorities determine that our facilities or procedures do not meet applicable requirements.**

*We are subject to periodic inspections by regulatory authorities, including the FDA and the USDA.* As part of these inspections, the regulatory authorities seek to determine whether our facilities and operations comply with applicable laws and regulations. Adverse findings as a result of these inspections could lead to enforcement actions, including substantial fines, warning letters that require corrective action (including potential facilities improvement requirements), revocation of approvals, exclusion from future participation in government healthcare programs, criminal prosecution and even the denial of the right to conduct business. *During the period from July through December 2021, one of the Envigo's U.S. facilities was inspected on several occasions by the USDA.*

***Following the inspection, USDA issued inspection reports with findings of noncompliance with certain USDA laws and regulations. Envigo formally appealed certain of the findings and the USDA has indicated it intends to conduct a formal investigation.*** The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. The imposition of any of these penalties or other restrictions on our business as a result of the inspections could adversely affect our business reputation and could have a material adverse impact on our financial condition, results of operations and stock price.

48.     On May 16, 2022, the Individual Defendants caused Inotiv to file its quarterly report on Form 10-Q for the period ended March 31, 2022. Regarding an Envigo facility, the report stated:

*Government Investigations*

During the period from July 2021 through March 2022, one of Envigo's U.S. facilities was inspected on several occasions by the U.S. Department of Agriculture ("USDA"). USDA issued inspection reports with findings of non-compliance with certain USDA laws and regulations. ***Envigo formally appealed certain of the findings, and has made multiple remediations and improvements at the facility, of which it has kept USDA apprised.*** USDA has indicated it intends to conduct a formal investigation. The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. As of the 10-Q filing date, no investigation had been initiated.

49.     The above statements were materially misleading because they failed to disclose: (1) that Envigo was already on notice of existing violations of applicable regulations at its Cumberland Facility; (2) that Envigo had failed to remediate these violations when given the opportunity to do so; and (3) that the continued violations were reasonably likely to expose Envigo to regulatory action.

**F.     The Truth Fully Emerges**

50.     On May 20, 2022, after the market closed, Inotiv disclosed a DOJ complaint filed against Envigo alleging violations of the Animal Welfare Act, after the DOJ had executed a search and seizure warrant at the Cumberland Facility.

14

51.     On May 21, 2022, Judge Moon of the United States District Court for the Western District of Virginia issued an amended temporary restraining order that was necessary to halt the alleged violations of the Animal Welfare Act. Specifically, the order stated that "Over 300 beagle puppies have died onsite due to 'unknown causes' over seven months. Many were not given anesthesia before they were euthanized by intracardiac injection." Moreover, "[n]ursing female beagles were denied food, and so they (and their litters) were unable to get adequate nutrition." Judge Moon stated "[t]he list of serious violations of the Animal Welfare Act and its regulations goes on and on." Citing the "overwhelming evidence" provided by the DOJ, the order found that "Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's implementing regulations to provide adequate veterinary care."

52.     On this news, the Company's share price fell $5.19, or 28%, to clos at $13.14 per share on May 23, 2022.

53.     On June 13, 2022, after the market closed, Inotiv announced that it was closing two Envigo facilities, mere months after the acquisition, due to the significant investments required to improve the facility. Specifically, the Company's press release stated:

> Robert Leasure, Jr., Inotiv's President and Chief Executive Officer commented, "Since the Envigo acquisition in November 2021, the Cumberland, Virginia, facility was recognized as needing improvements and investments. Inotiv has been pleased with the continued and significant progress in improvements at the Cumberland facility since the acquisition, as evidenced by recent inspections by the USDA and other auditing organizations. We sincerely appreciate our customers', employees', and third-party input to date in support of this facility. ***The required investments to improve the facility and the lead time to achieve these improvements have recently increased. As a result, we have decided we will not be investing further in this facility, and it will be closed.*** We will implement an orderly closure plan. Cumberland comprises less than 1% of our total Inotiv revenue and has not contributed to profits in our Research Models and Services segment since the acquisition."

54.     On this news, the Company's share price fell $0.25, or 2%, to close at $12.78 per share on June 14, 2022.

55.     On November 17, 2022, Inotiv revealed that the U.S. Attorney's Office for the Southern District of Florida criminally charged employees of the Company's principal supplier of non-human primates ("NHPs") with conspiring to illegally import NHPs into the U.S. from December 2017 through January 2022.

56.     On this news, the Company's share price fell $9.03, or 57%, to close at $6.82 per share on November 17, 2022.

## VI.     DAMAGES TO THE COMPANY

57.     As a direct and proximate result of the Individual Defendants' conduct, Inotiv has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)      Penalties for, and costs to remediate, the ongoing violations of the AWA at the Cumberland Facility;

b)      Any funds paid to settle the Securities Class Action; and

c)      Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Inotiv.

58.     In addition, Inotiv's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

59.     The actions complained of herein have irreparably damaged Inotiv's corporate image and goodwill.  For at least the foreseeable future, Inotiv will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Inotiv's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.    Plaintiff brings this action derivatively in the right and for the benefit of Inotiv to redress injuries suffered, and to be suffered, by Inotiv as a direct result of the wrongdoing alleged herein.  Inotiv is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

61.    Plaintiff will adequately and fairly represent the interests of Inotiv in enforcing and prosecuting its rights.

62.    Plaintiff has continuously been a shareholder of Inotiv at times relevant to the wrongdoing complained of and is a current Inotiv shareholder.

63.    When this action was filed, Inotiv's Board of Directors consisted of defendants Leasure, Davis, Johnson, Sagartz, Neff, Brown, and Cragg. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

64.    Leasure is the Company's CEO and therefore is not independent under NASDAQ listing rules. As an employee, Leasure derives substantially all of his income from his employment with Inotiv, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis. He is also named as a defendant in the Securities Class Action. As a result, demand is futile as to him.

65.    The entire Board is charged with overseeing the Company's affairs and purported to conduct due diligence prior to approving the acquisition of Envigo. In this respect, the entire Board knew or should have known of the material facts concerning Envigo, including the results of the inspections by the USDA of the Cumberland Facility and the ongoing violations of the AWA. In their capacities as directors, Leasure, Davis, Johnson, Sagartz, Neff, Brown, and Cragg

issued materially misleading statements, including the 2021 10-K and the October 2021 proxy statement, and face a substantial likelihood of liability.

66.     Brown and Cragg were appointed to the Board by certain stockholders who collectively held 72.6% of the outstanding voting stock of Envigo. Prior to their service on Inotiv's Board, they served as directors of Envigo and thus knew or should have known of the ongoing violations at the Cumberland Facility, but failed to disclose the same. As a result, demand is futile as to them.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

67.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

68.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Inotiv's business and affairs, particularly with respect to issues as fundamental as public disclosures.

69.     The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Inotiv.

70.     In breach of their fiduciary duties owed to Inotiv, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

71.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Company's overall prospects.

72.     As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Inotiv has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT II

**(Against Defendants Leasure and Taylor for Contribution
For Violations of Sections 10(b) and 21D of the Exchange Act)**

73.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.     The conduct of Defendants Leasure and Taylor, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

75.     Inotiv is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Inotiv is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

76.     As officers, directors and otherwise, Defendants Leasure and Taylor had the power or ability to, and did, control or influence, either directly or indirectly, Inotiv's general affairs,

including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

77.    Defendants Leasure and Taylor are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

78.    Defendants Leasure and Taylor have damaged the Company and are liable to the Company for contribution.

79.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT III

**(Against Defendants Leasure, Davis, Johnson, Sagartz, Neff, and Cragg For Violations of Section 14(a) of the Exchange Act)**

80.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

81.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on October 5, 2021 violated §14(a) and Rule 14a-9 because it solicited stockholder approval for the Authorized Share Increase Proposal, Merger Share Issuance Proposal, and amendments to the 2018 EIP while failing to disclose material facts about Envigo's business.

82.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

83.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited stockholder votes for: (i) Authorized Share Increase Proposal; (ii) Merger Share Issuance Proposal; (iii) amendment to the 2018 EIP; and (iv) approval of the issuance of common shares related to the conversion of certain senior notes. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

84.     The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Inotiv, demands judgment as follows:

A.      Declaring that plaintiff may maintain this action on behalf of Inotiv and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Inotiv;

D.      Directing Inotiv to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inotiv and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Inotiv's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Inotiv to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Inotiv has an effective remedy;

F.      Awarding to Inotiv restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: January 4, 2023              By: /s/ Brad A. Catlin
                                           **WILLIAMS & PIATT, LLC**
                                           Brad A. Catlin, Atty No. 21570-29
                                           1101 North Delaware Street
                                           Indianapolis, IN  46202
                                           Telephone:  (317) 633-5270
                                           brad@williamspiatt.com

                                           **GLANCY PRONGAY & MURRAY LLP**
                                           Benjamin I. Sachs-Michaels
                                           745 Fifth Avenue

New York, New York 10151
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com
        prajesh@glancylaw.com

**THE PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: (310) 692-8883
Email: lesley@portnoylaw.com

*Counsel for Plaintiff William Noble Burkhart*

23

DocuSign Envelope ID: 17DFF424-662A-4FB5-8CCD-722ABA5E54A1

## VERIFICATION

I, William Noble Burkhart, do hereby verify that I am a holder of common stock of Inotiv, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   12/22/2022

*William N. Burkhart*
06344B9D93C74E9

William Noble Burkhart